AMY BISSON HOLLOWAY, State Bar No. 163731
General Counsel
PETER J. STUBBS, State Bar No. 127919
Deputy General Counsel
California Department of Education
1430 N Street, Room 5319
Sacramento, CA 95814
Telephone: (916) 319-0860
Facsimile: (916) 319-0155
pstubbs@cde.ca.gov

Attorneys for Defendants California Department of Education
and State Superintendent of Public Instruction, Tom Torlakson

(Respondents are a Governmental Agency and Exempt from the Provision of FRCP 7.1 and LR 7.1-1.)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.C., a minor, by and through his *Guardian ad Litem*, Gail Campos, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, JR., in his official capacity as Governor of the State of California; CALIFORNIA DEPARTMENT OF EDUCATION; TOM TORLAKSON, in his official capacity California State Superintendent of Public Instruction; et al.,<br><br>        Defendants. | Case No. 2:10-cv-07956-GW (AGRx)<br><br>**CLASS ACTION**<br><br>**STATE EDUCATION DEFENDANTS' OPPOSITION TO PLAINTIFFS' (BIFURCATED) MOTION FOR ATTORNEYS' FEES (20 U.S.C. § 1415(i)(3)(B))**<br><br>Date:     May 19, 2011<br>Time:     8:30 a.m.<br>Courtroom: 10<br>Judge:    Honorable George H. Wu |

# TABLE OF CONTENTS

Page No.

I. INTRODUCTION ..................................................................................1

II. LEGAL STANDARD ............................................................................1

III. PROCEDURAL AND FACTUAL BACKGROUND ...........................2

    A. The Governor's Veto and The $76 Million .................................. 2

    B. CDE/SPI Distributed the $76 Million Federal Funding Independently Of This Litigation............................................................................. 4

    C. The Stipulation for Withdrawal of Plaintiffs' Application for TRO .........7

IV. THE STIPULATED WITHDRAWAL OF PLAINTIFFS' APPLICATION FOR A TRO IS NOT AN ENFORCEABLE ORDER FOR RELIEF AGAINST CDE/SPI ...........................................9

V. THE STIPULATED WITHDRAWAL OF PLAINTIFFS' APPLICATION FOR A TRO DID NOT REQUIRE CDE/SPI TO DO ANYTHING THEY WOULD NOT HAVE DONE ANYWAY ...............................................................................................13

VI. ANY CHANGE IN LEGAL RELATIONS IS NOT MATERIAL IN THE CONTEXT OF THIS LAWSUIT ...............................................14

VII. CONCLUSION ....................................................................................15

# TABLE OF AUTHORITIES

Page No.

**Cases**

Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.
532 U.S. 598 (2001) .................................................................................... passim

Carbonell v. INS
429 F.3d 894 (9th Cir. 2005) ............................................................................ 14

Klamath Siskiyou Wildlands Center v. U.S. Bureau of Land Management
589 F.3d 1027, 1031 (9th Cir. 2009) ......................................................... passim

P.N. v. Seattle School District, No. 1
474 F.3d 1165 (9th Cir. 2007) ............................................................................ 2

Shapiro v. Paradise Valley Unified School District No. 69
374 F.3d 857 (9th Cir. 2004) ......................................................................... 1, 9

**Federal Statutes**

IDEA, 20 U.S.C. § 1400, et seq. .......................................................................... 2

20 U.S.C. § 1411(e) ............................................................................................ 3

20 U.S.C. § 1411(e)(2)(A) .................................................................................. 4

20 U.S.C. § 1411(e)(2)(C)(iii) .................................................................... passim

**State Statutes**

2010 Budget Act (SB 870, Statutes of 2010, Ch. 712) ............................... passim

AB 3632 ..................................................................................................... passim

SB 1895, § 9 (Statutes of 2004, Ch 493) ............................................................ 3

Education Code, § 56195 et seq. ......................................................................... 5

**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

Defendants California Department of Education and Superintendent of Public Instruction, Tom Torlakson (collectively CDE/SPI) respectfully submit their Opposition to Plaintiffs' Motion for Attorneys' Fees filed April 15, 2011. (Dkt. No. 236.)

On April 26, 2011, the Court granted defendants' joint ex parte application to bifurcate plaintiffs' motion to address first only the threshold issue of whether plaintiffs are a "prevailing party" for the purpose of obtaining a fee award. Consequently, this opposition addresses only that issue.

## I. INTRODUCTION

Plaintiffs' motion for attorneys' fees must be denied for the following reasons:

1. Plaintiffs cannot establish that they are a "prevailing party" because the stipulated withdrawal of their ex parte application for a temporary restraining order (TRO) as to CDE/SPI does not, by its own terms, constitute the required "enforceable entitlement" to distribution of the $76 million in federal IDEA funding.

2. CDE/SPI always intended to distribute the $76 million of IDEA funding, but, in light of the Governor's veto, needed to research and establish an alternative legal justification for its allocation to support the provision of AB 3632 services by county mental health agencies. Therefore, the stipulated withdrawal of plaintiffs' application for a TRO did not require CDE/SPI to do anything they would not have done in any event.

3. In the context of plaintiffs' abject failure, after several months' effort, to establish any right to or merit supporting the wide-ranging relief sought in their complaint and motions for injunctive relief, CDE/SPI's release of the $76 million was not material.

## II. LEGAL STANDARD

Under *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001), applied to the attorney's fee provision of IDEA by *Shapiro v. Paradise Valley Unified School District No. 69*, 374 F.3d 857, 865 (9th Cir. 2004), "in

-1-

Case No. 2:10-cv-07956-GW (AGRx)　　　　State Education Defendants' Opposition To Plaintiffs' Motion (Bifurcated) for Attorneys' Fees

order to be considered a 'prevailing party' after *Buckhannon*, a plaintiff must not only achieve some 'material alteration of the legal relationship of the parties,' but that change must also be *judicially sanctioned.* " *Shapiro* at 865, emphasis added; *See also, P.N. v. Seattle School District, No. 1*, 474 F.3d 1165, 1170-71 (9th Cir. 2007).

As explained in *Klamath Siskiyou Wildlands Center v. U.S. Bureau of Land Management*, 589 F.3d 1027 (9th Cir. 2009), to be "judicially sanctioned" the "material alteration of the legal relationship" must be incorporated in a judicially-enforceable order:

> In short, the judicial sanction must be an *enforceable entitlement* to relief. It must 'allow[ ] one party *to require the other party to do something it otherwise would not be required to do.*' Jankey v. Poop Deck, 537 F.3d 1122, 1130 (9th Cir.2008) (internal quotation marks omitted). To receive what one sought is not enough to prevail: the court must require one's opponent to give it.
>
> All together, this case law establishes that the sine qua non of prevailing party status is an enforceable, judicially sanctioned award of *much of the relief the plaintiff sought.* See [Citizens for Better Forestry v. U.S. Forest Serv., 567 F.3d 1128, at 1131 (9th Cir.2009)] ("[A] party must have a judgment or something similar formally delivered in its favor to be considered 'prevailing.' "); [Carbonell v. INS, 429 F.3d 894, (9th Cir.2005)] at 900.

*Klamath* at 1031, original and added emphasis.

Finally, *Klamath* also establishes that to be "material," the judicially-sanctioned change in legal relationship must be "much of the relief the plaintiff sought." *Id.*, 1031-32.

### III. PROCEDURAL AND FACTUAL BACKGROUND

#### A. The Governor's Veto and The $76 Million

On October 8, 2010, Governor Schwarzenegger vetoed certain provisions of the 2010 Budget Act (SB 870, Statutes of 2010, Ch. 712) related to the provision of AB 3632 mental health services. The Governor vetoed the provision which provided for $132,941,000 to reimburse counties for mandate claims for the 2004-05 through 2008-09 fiscal years for costs incurred in providing AB 3632 services to children receiving special education under IDEA (20 U.S.C. § 1400, et seq.). The Governor also purported

-2-

to suspend the mandate on counties to provide these services. (SB 870, p. 12; Dec. of Peter J. Stubbs, Ex. 2, Dkt. No. 175, p. 13.)

The Governor also vetoed the provision related to the $76 million in federal IDEA funds to support AB 3632 services in the current budget year. Federal IDEA funding totaling $1,232,319,000 and its allocation by the Legislature (Item 6110-161-0890) are found at SB 870, *supra*, pp. 536-539. (Dec. of Peter J. Stubbs, Ex. 2, Dkt. No. 175, pp. 19-22.)

Schedule (4) of that Item provides $81,614,000 for IDEA State Level Activities. SB 870, *supra*, Ch 712, p. 536; Dkt. No. 175, p. 19. Under 20 U.S.C. § 1411(e), a state is authorized to reserve some IDEA funding for so-called "state-level activities," namely administration and "other state-level activities." Provision 9 applicable to this Item, SB 870, *supra*, Ch 712, p. 538, states:

> Of the funds appropriated in Schedule (4), $76,000,000 shall be used exclusively to support mental health services that are provided during the 2010–11 fiscal year by county mental health agencies pursuant to Chapter 26.5 (commencing with Section 7570) of Division 7 of Title 1 of the Government Code [AB 3632] and that are included within an individualized education program pursuant to the federal Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.). Each county office of education receiving these funds shall contract, on behalf of special education local planning areas in its county, with the county mental health agency to provide specified mental health services. This funding shall be considered offsetting revenues within the meaning of subdivision (e) of Section 17556 of the Government Code for any reimbursable mandated cost claim for provision of the mental health services provided in the 2010–11 fiscal year. Amounts allocated to each county office of education shall reflect the share of the $76,000,000 in federal special education funds provided to that county in the 2004–05 fiscal year for mental health services provided pursuant to [AB 3632].

The origin of this provision can be traced back to SB 1895, § 9, Statutes of 2004 Ch 493, pp. 10-12 (*see* Dec. of Peter J. Stubbs, Ex. 1, Dkt. No. 175, pp. 6-9) where $69 million was allocated to county offices of education to support mental health services provided by county mental health agencies under AB 3632. Under 20 U.S.C. § 1411(e)(2)(C)(iii), a state may use funds reserved for other state-level activities, "To assist local educational agencies in providing positive behavioral interventions and supports and appropriate mental health services for children with disabilities." When

1  IDEA was reauthorized, this $69 million became the maximum amount permitted for
2  these purposes. *See* 20 U.S.C. § 1411(e)(2)(A). The amount of $69 million has been
3  allocated in the budget for the same purpose every year since 2004. In the 2010-11
4  budget, the amount of $69 million was increased to $76 million by a one-time carryover
5  of $7 million from the previous year. SB 870, *supra*, Ch. 712 p. 539, Provision 14 (Dkt.
6  No. 175, p. 22.)

**B.   CDE/SPI Distributed the $76 Million Federal Funding Independently Of This Litigation**

By deleting Provision 9, the Governor removed the legal authority for CDE to distribute, as in prior years, the $76 million to county offices of education for allocation to county mental health agencies to support mental health services under AB 3632, in accordance with SB 1895. Thus, the effect of the Governor's veto was to leave $76 million of IDEA funding unallocated in the budget. Dec. of Stubbs, ¶ 2.

Although this was an unprecedented situation, CDE/SPI always intended to send out the $76 million, as it was part of special education's normal budget allocation. CDE/SPI's strong preference was to find, if possible, an alternative legal basis to use the funding to support AB 3632 services consistent with past practice. Dec. of Stubbs, ¶ 3.

Until a budget was passed, CDE could not allocate any funding. The veto was on *Friday*, October 8, 2010. Mr. Balcom met with his staff to discuss budget issues affecting special education arising out of the veto on *Monday*, October 11, 2010. Discussed at this meeting were the effect of the deletion of Provision 9 and whether the $76 million could be allocated to counties or LEAs to pay to AB 3632 services were discussed. Dec. of Balcom, ¶¶ 1, 2.

On October 13, Mr. Balcom also met with Sharon Taylor, CDE's Director of Fiscal and Administrative Services Division, to discuss the budget ramifications of the Governor's elimination of Provision 9 as it impacted the allocation of the $76 million. Dec. of Balcom, ¶ 3.

On October 21, CDE representatives, including Mr. Balcom, the Chief Deputy Superintendent, and the Deputy Superintendent overseeing special education, met with

key legislative staff representatives (Democratic and Republican) of the Senate and Assembly and their respective budget committees. Dec. of Balcom, ¶ 4; Dec. of Stubbs, ¶ 3.

On October 22, Mr. Balcom met with the SELPA Executive Committee, the leadership of the statewide SELPA organization; there are about 128 SELPAs, special education local plan areas, the local governance structure for special education in its area, Cal. Educ. Code, § 56195 et seq. Dec. of Balcom, ¶ 5.

On October 25 and again on October 28, Mr. Balcom met with CDE personnel, including the Chief Deputy Superintendent, the Deputy Superintendent for special education, and CDE legislative liaisons and education fiscal services consultants. Dec. of Balcom, ¶ 6; Dec. of Stubbs, ¶ 2.

The purpose of all the above meetings was to resolve how to get the $76 million out to support AB 3632 services after the Governor's veto of the normal budget provision granting authority to use the funding to support AB 3632 services. Dec. of Balcom, ¶ 7.

One argument was that Provision 1 of Item 6110-161-0890 was authority to distribute the $76 million as *local entitlements* under Schedules (1), (2) and (3) (thus, not necessarily for AB 3632 services). *See* SB 870, *supra*, pp. 536-37, Dkt. No. 175, pp. 19-20; Dec. of Stubbs, ¶3.

Provision 1 of Item 6110-161-0890 specifies the amount of California's IDEA Part B grant for the 2010-11 fiscal year. In the event the grant award is higher than indicated, Provision 1 states that 95 percent of the funds are to be used for local entitlements and 5 percent may be used for administration upon Department Of Finance approval; and in the event the grant award is less than indicated, the reduction is to be taken out of other state-level activities.

However, CDE was of the opinion that the veto of Provision 9 authorizing the funds to be used for AB 3632 mental health services did not affect the amount of the grant award to California. Thus, CDE ultimately concluded, Provision 1 did *not* apply.

- 5 -

Case No. 2:10-cv-07956-GW (AGRx)   State Education Defendants' Opposition To Plaintiffs' Motion (Bifurcated) for Attorneys' Fees

Rather, CDE believed that funding for state-level activities in Schedule (4) is provided for program-specific activities. Local entitlement funding is provided in Schedules (1), (2) and (3), and is based on the federal formula. Absent separate legislation, the CDE believed the only appropriate way to distribute the $76 million as local entitlements was through the authority granted under Section 28 of the Budget Act, which provides for the Director of Finance to approve the expenditure of "unanticipated federal funds or other nonstate funds." (SB 870, *supra*, pp. 782-84.) Dec. of Stubbs, ¶3.

However, CDE was not prepared to wait for legislation or Section 28 approval. Rather, CDE believed in principle that it was undesirable to allocate the $76 million to local entitlements, as CDE would not have the same control previously provided under SB 1895 and Provision 9 to ensure its use exclusively for AB 3632 mental health services. Dec. of Stubbs, ¶ 4.

While 20 U.S.C. § 1411(e)(2)(C)(iii), *supra*, authorizes a state to use funds reserved for other state-level activities to assist local educational agencies in providing mental health services for children with disabilities (*supra*), the Governor had vetoed the very language granting authority to use the $76 million for this purpose. Apparently, the Senate Budget Committee also believed that the veto of Provision 9 meant there was no funding for AB 3632 services. See Dec. of Faer, ¶ 35 and Ex. F.

At no time did CDE ever refuse to send out the $76 million or ever tell anyone it would not be sent out, as plaintiffs allege. Contrary to the impression given by plaintiffs, CDE could not just send out the $76 million without having proper legal authority to do so. Mr. Stubbs' e-mail to plaintiffs' counsel (Dec. of Faer, Ex. L) was simply a genuine request to discuss any ideas she might have for resolving the problem created by the veto of Provision 9. Her only response was to rely on 20 U.S.C. § 1411(e)(2)(C)(iii). While that may have been good enough for Ms. Faer, it did not add anything new to the discussion within CDE that was not already known. Dec. of Stubbs, ¶¶ 6-8.

In the end, the "saving grace" turned out to be something *not* proposed by Ms. Faer. As noted above, the $76 million included $7 million carried over from the previous budget year's Provision 9 for AB 3632 services. That money carried with it the

necessary authority to use it for AB 3632 services. On October 28, CDE concluded that authority was sufficient to permit *all* of the $76 million to be used for AB 3632 services, and consistent with the federal authority under 20 U.S.C. § 1411(e)(2)(C)(iii). Final approval to distribute the funding for AB 3632 services was received late in the day on October 28, and Mr. Stubbs then communicated to Ms. Faer that CDE intended to allocate the $76 million exclusively for AB 3632 services, as in prior years. Dec. of Balcom, ¶ 8; Dec. of Stubbs, ¶ 9.

### C. The Stipulation for Withdrawal of Plaintiffs' Application for TRO

As discussed above, the CDE had been working diligently from October 11 to resolve the difficult question of the disposition of the $76 million, for which budgetary authority had been deleted by the Governor. While CDE certainly wished to use the money to support AB 3632 services as in prior years, the Legislature and DOF took a different view of the legal status of the funds, and were proposing the money be used for "local entitlements," i.e. LEAs, and, if it were, CDE was concerned that it could not assure the money would be used exclusively to support AB 3632 services.

When plaintiffs' counsel injected their "demand letter" (Dec. of Faer, Ex. D) on October 20, 2010, into matters, CDE staff and counsel had already been working on the issue of the $76 million for 9 days. Moreover, the "demand letter" did not specifically address the $76 million issue, but instead demanded the restoration of the vetoed $133 million. Moreover, in their ex parte application for a TRO filed at 3:59 p.m. on October 28, 2010, plaintiffs sought an order for CDE to disburse IDEA funds to *SELPAs* (Dkt. No. 18, pp. 8-9), thus demonstrating plaintiffs' own uncertainty as to the allocation of the $76 million.

It should also be noted that the demand letter, Ex. D, attached a copy of Fred Balcom's directive of October 18, 2010, to all SELPAs, LEAs, etc. reminding them of their obligation under State and federal law to provide and/or pay for mental health services in case of default by county mental health agencies. (Dkt. No. 236-14, pp. 14-15.) It also refers to a similar March 5, 2010, directive to the same effect.

-7-

At 5:59 p.m. on October 26, 2010, Ms. Faer e-mailed a copy of the draft Stipulated TRO with the local defendants to CDE's counsel, Mr. Stubbs. Dec.of Faer, Ex. J. At 8:37 p.m. on October 27, 2010, she e-mailed Mr. Stubbs a revised draft of the same Stipulated TRO. Dec. of Faer, Ex. K.

By the time Plaintiffs filed their Ex Parte Application for TRO at 3:59 p.m. on October 28, CDE had already identified a solution reached for the allocation of the $76 million to AB 3632 services. Shortly thereafter, final approval for the decision was received and CDE's counsel, Mr. Stubbs, informed Ms. Faer by telephone of the decision and told her that the SPI would be issuing a public announcement on the following day, October 29. Dec. of Stubbs, ¶ 9.

Based on this development, plaintiffs agreed to withdraw their application for a TRO as to CDE/SPI. Based on a discussion between Mr. Stubbs and plaintiffs' counsel, Melinda Bird, it was decided to put the withdrawal in a stipulation to be filed with the Court. The form of stipulation was agreed and filed on October 30, 2010, and signed by the Court on November 9, 2010. (Dkt. Nos. 26 and 39.) Dec. of Stubbs, ¶ 11.

Paragraph 1 of the stipulation merely recites the filing of the Ex Parte Application for TRO.

Paragraph 2 provides, emphasis added:

> On October 29, 2010, Mr. O'Connell announced that the Department of Education was releasing $76 million in federal special education funds reserved for state-level activities to be allocated under 20 U.S.C. § 1411(e)(2)(c)(iii) to county offices of education for the provision of educationally-related mental health services by county mental health agencies, consistent with prior practice. *Plaintiffs and the State Education Defendants agree that this action renders moot this portion of the request for relief.*

This language clearly does not amount to a court order for the release of the $76 million. It recites the prior unilateral announcement (not an agreement) by the SPI on October 29 of CDE's decision to release the funding, then specifically *disclaims* that the release of these funds is subject to any "claim for relief," which has been rendered "moot."

- 8 -

Case No. 2:10-cv-07956-GW (AGRx)    State Education Defendants' Opposition To Plaintiffs' Motion (Bifurcated) for Attorneys' Fees

Paragraph 3 is merely an expression of agreement as to the probable effect of the release of funds on the local agencies, and an expression of certain future intent by both parties, but imposes no court-ordered obligations on either side.

More importantly, paragraph 5 specifically states that, "Nothing in this stipulation or stipulated withdrawal shall constitute an admission by any party in connection with the determination of prevailing parties for the purposes of any motion or application for attorneys' fees." This language was inserted at the request of CDE to make clear that this stipulated withdrawal would *not* be used as the basis for any claim for attorneys' fees. Plaintiffs now seek improperly to use that stipulation as the basis of this claim for attorneys' fees. This language is also evidence that the parties did not agree to the stipulation being an enforceable order for relief, as is also supported by paragraph 2's express disclaimer of any claim for relief regarding the release of the $76 million.

In short, there is no *enforceable order* in the stipulated withdrawal for the release of the $76 million that can support a finding that plaintiffs are a "prevailing party" for the purposes of attorney's fees. Moreover, it is clear that CDE/SPI would have released the $76 million regardless of plaintiffs' actions in filing a lawsuit and the application for a TRO.

## IV. THE STIPULATED WITHDRAWAL OF PLAINTIFFS' APPLICATION FOR A TRO IS NOT AN ENFORCEABLE ORDER FOR RELIEF AGAINST CDE/SPI

Plaintiffs' litany of self-congratulation cannot obscure the central and fatal deficiency of their motion as to CDE/SPI, namely that plaintiffs cannot establish, as a matter of law, that they are a "prevailing party."

As discussed above, under *Shapiro* and *Klamath*, for plaintiffs to be a "prevailing party" as to CDE/SPI, they must show that they achieved a material alteration in their legal relationship with CDE/SPI, in the form of a judicially sanctioned, enforceable entitlement to relief by which they could require CDE/SPI to do something they otherwise would not be required to do. This, plaintiffs simply cannot do.

Contrary to plaintiffs' contention, the stipulated *withdrawal* of plaintiffs' application for a TRO (Dkt. Nos. 26 and 39) *by its own terms* does not constitute the

- 9 -

Case No. 2:10-cv-07956-GW (AGRx)   State Education Defendants' Opposition To Plaintiffs' Motion (Bifurcated) for Attorneys' Fees

required "enforceable entitlement" to distribution of the $76 million in federal IDEA funds previously announced by the then-SPI, Jack O'Connell, on October 29, 2010. Moreover, although the withdrawal was premised on CDE/SPI's voluntary announcement of its decision to distribute the funding, there was no judicial ruling that plaintiffs were entitled to any relief. In the event that CDE/SPI did not distribute the money, plaintiffs would have had to either reinstate their application for a TRO or pursue such relief in their motion for a preliminary injunction. *Klamath* at 1033.

Paragraph 1 of the stipulation merely recites the filing of the Ex Parte Application for TRO.

Paragraph 2 provides, emphasis added:

> On October 29, 2010, Mr. O'Connell announced that the Department of Education was releasing $76 million in federal special education funds reserved for state-level activities to be allocated under 20 U.S.C. § 1411(e)(2)(c)(iii) to county offices of education for the provision of educationally-related mental health services by county mental health agencies, consistent with prior practice. *Plaintiffs and the State Education Defendants agree that this action renders moot this portion of the request for relief.*

This language clearly does not amount to a court order for the release of the $76 million. It recites the prior unilateral announcement (not an agreement) by the SPI on October 29 of CDE's decision to release the funding, then specifically *disclaims* that the release of these funds is subject to any "claim for relief," which has been rendered "moot."

Paragraph 3 is merely an expression of agreement as to the probable effect of the release of funds on the local agencies, and an expression of certain future intent by both parties, but imposes no court-ordered obligations on either side.

More importantly, paragraph 5 specifically states that, "Nothing in this stipulation or stipulated withdrawal shall constitute an admission by any party in connection with the determination of prevailing parties for the purposes of any motion or application for attorneys' fees." This language was inserted at the request of CDE to make clear that this stipulated withdrawal would *not* be used as the basis for any claim for attorneys'

- 10 -

Case No. 2:10-cv-07956-GW (AGRx)  State Education Defendants' Opposition To Plaintiffs' Motion (Bifurcated) for Attorneys' Fees

fees. Plaintiffs now seek improperly to use that stipulation as the basis of this claim for attorneys' fees. This language is also evidence that the parties did not agree to the stipulation being an enforceable order for relief, as is also supported by paragraph 2's express disclaimer of any claim for relief regarding the release of the $76 million.

In short, there is no *enforceable order* in the stipulated withdrawal for the release of the $76 million that can support a finding that plaintiffs are a "prevailing party" for the purposes of attorney's fees. Moreover, it is clear that CDE/SPI would have released the $76 million regardless of plaintiffs' actions in filing a lawsuit and the application for a TRO.

Plaintiffs argue that their ex parte application for a TRO and "negotiations" with CDE "caused" CDE to announce it was releasing $76 million, which prior to the ex parte application "CDE did not intend to release." Plaintiffs' Ps and As, pp. 16-17; Dkt. No. 236, pp. 21-22. Plaintiffs appear to be arguing that they catalyzed the CDE/SPI to act, a basis for attorneys' fees which has been repudiated by *Buckhannon, supra*, 532 U.S. at 605.

Further, as set forth in the chronology above, the facts do not support Plaintiffs' contention. CDE/SPI staff acted to try to identify and release any and all available funds the Monday after the Governor's Friday veto, and weeks before the filing of this lawsuit. Therefore, plaintiffs cannot be a prevailing party based on this argument.

Plaintiffs also argue that the stipulation for withdrawal of their application for a TRO was "a legally enforceable reassurance that CDE would transfer funds to Local Defendants, who required such reassurance before agreeing to restore AB 3632 services...The parties understood that CDE's assurance was a prerequisite to securing the Stipulated TRO with Local Defendants to restore the interrupted mental health services." Plaintiffs' Ps and As, p. 20; Dkt. No. 236, p. 25.

As demonstrated above, however, the stipulated withdrawal did not create any enforceable right to distribution of the $76 million, because paragraph 2 of the stipulation expressly declared any application for relief to be moot.

- 11 -

As the SPI had issued a press release on October 29 publicly stating his intent to distribute the $76 million ("State Schools Chief O'Connell Announces Release of $76 Million to Maintain Mental Health Services for Students with Disabilities Despite Governor's Veto," October 29, 2010; http://www.cde.ca.gov/nr/ne/yr10/yr10rel122.asp), plaintiffs doubtless felt there was no need for a court order, as reflected in the stipulation.

Moreover, the fact that a dismissal (here, withdrawal of the application for TRO) is premised on certain assurances or undertakings is insufficient to confer prevailing party status, without a judicial ruling of entitlement to relief. *Klamath, supra*, at 1033. So here, any assurances by CDE/SPI to distribute the $76 million are insufficient to confer prevailing party status on plaintiffs. On the contrary, the stipulation specifically stated that any claim for relief in this regard was moot.

Plaintiffs' claim (Ps and As, pp. 20-21; Dkt. No. 236, pp. 25-26) that paragraph 3 of the stipulation also creates enforceable obligations is also without merit. Paragraph 3 merely recites CDE/SPI's intent to issue a further directive regarding the obligation of local education agencies to provide or pay for related mental health services when a non-educational agency fails to do so. CDE/SPI had already issued similar directives on March 5, 2010, and October 18, 2010, *supra*, so this was not a material change in CDE/SPI's position.  The remaining portion of paragraph 3 states that "[CDE/SPI] *will continue* to exercise the authority delineated in relevant statutes and regulations to ensure compliance regarding access to related mental health services." Again, this is merely a statement that CDE/SPI will go on doing what it has already been doing, and thus does not represent any change in position that would confer prevailing party status on plaintiffs. Moreover, these statements of intent are insufficient to confer prevailing party status as there is no judicial finding of entitlement to relief. *Klamath, supra*.

Plaintiffs also contend (Ps and As, p. 24; Dkt. No. 236, p. 29) that paragraph 5 of the stipulation does not preclude a finding they are a prevailing party, citing cases where a consent decree supported prevailing party status without an admission of liability.

- 12 -

These cases are clearly distinguishable because, here, the disclaimer of liability *goes directly to the issue of any motion or application for attorneys' fees*, as opposed to liability in the underlying action. Rather, paragraph 5 clearly supports CDE/SPI's contention that the stipulated withdrawal could be used to support a claim by plaintiffs to be prevailing parties.

In short, plaintiffs cannot withdraw their application for a TRO and then claim the withdrawal is the functional equivalent of a TRO.

## V. THE STIPULATED WITHDRAWAL OF PLAINTIFFS' APPLICATION FOR A TRO DID NOT REQUIRE CDE/SPI TO DO ANYTHING THEY WOULD NOT HAVE DONE ANYWAY

To be judicially sanctioned, there must be an enforceable entitlement to relief, allowing one party to require the other party to do something it otherwise would not be required to do. *Klamath, supra*, at 1031.

As established by the Declarations of Fred Balcom and Peter J. Stubbs, filed herewith, CDE/SPI always sought to distribute the $76 million, before and independently of any action by plaintiffs. After the Governor's veto on October 8, 2010, eliminated the underlying budgetary authority to distribute this funding as in every prior year since 2004, CDE immediately began diligently to investigate alternative ways to distribute the funding to support AB 3632 mental health services. Here, the evidence establishes that CDE/SPI began discussions to address the Governor's veto on October 11, 2010, and pursued the matter diligently thereafter, well before plaintiffs filed their lawsuit and application for a TRO on October 28, 2010.

By the time plaintiffs filed their TRO application on October 28, 2010, at 3:59 p.m., the process for finding a legally-supported way to distribute the $76 million to support AB 3632 services was complete, as evidenced by the number of meetings of high-level personnel that had already taken place within CDE, and a decision made to release the funding. It is simply untrue that CDE was refusing to distribute the $76 million. However, there had to be authority to do so. Contrary to the wholly false

- 13 -

impression given by plaintiffs, this was not an easy problem to resolve. CDE wished to distribute the funding in a manner that ensured its use to support AB 3632 services.

Plaintiffs' counsel did not become actively involved with CDE/SPI on the issue of the $76 million until October 26, 2010. Dec. of Faer, paragraph 43. By this time, the battle was almost over. Ms. Faer did not contribute anything to the discussion that was not already known to CDE in terms of the legal basis for the distribution of the $76 million. By the time plaintiffs filed their application for a TRO at 3:59 p.m. on October 28, CDE had made the decision to release the funding. Therefore, the stipulated withdrawal of the TRO did not require CDE/SPI to do anything they would not have done anyway.[1]

Plaintiffs are like parties that come along after the battle is won and want to claim all the credit for themselves. However, regardless of plaintiffs' lawsuit and application for a TRO, CDE/SPI would have released the funding when they did. Therefore, the stipulated withdrawal of the application for TRO did not require CDE/SPI to do anything they would not have done anyway.

## VI. ANY CHANGE IN LEGAL RELATIONS IS NOT MATERIAL IN THE CONTEXT OF THIS LAWSUIT

To confer prevailing party status, any change in legal relations must be material in the context of the claims in the lawsuit. Plaintiffs cite *Carbonell v. INS*, 429 F.3d 894 (9th Cir.2005) for the proposition that a stipulated TRO can support prevailing party status. (Plaintiffs' Ps and As, p. 23; Dkt. No. 236, p. 28.) However, in *Klamath, supra*, at 1031-32, the court pointed out that, "*Carbonell* grants no special status to stipulations. What mattered there was that the stay saved an otherwise imminently removable immigrant from deportation. *This was much of the relief he sought*." Internal quotation marks omitted, emphasis added.

---

[1] The only "evidence" submitted by plaintiffs on this issue is the inadmissible hearsay e-mail of Ron Wenkert (Dec. of Faer, ¶ 32 and Ex. G thereto). *See* CDE/SPI's Joinder in Defendants Torrance USD and Mannon's Objections to Evidence filed herewith.

- 14 -

Case No. 2:10-cv-07956-GW (AGRx)    State Education Defendants' Opposition To Plaintiffs' Motion (Bifurcated) for Attorneys' Fees

Here, the stipulated withdrawal of the application for a TRO was no relief at all. Moreover, even if, for the sake of argument, the distribution of the $76 million was enforceable relief, it was still not material. Plaintiffs sought wide-ranging relief in their lawsuit and motions for preliminary injunctions, nothing less than restoration of AB 3632 services to their pre-veto status. *See* Minute Order denying plaintiffs' motions for preliminary injunction, Dkt. No. 224, p. 6. Indeed, despite the passage of almost five months, plaintiffs failed to show "that any Representative Plaintiff has suffered actual harm or is in danger of imminent harm...Indeed, based on Plaintiffs' complete avoidance of harm to the Representative Plaintiffs in either of their Supplemental Briefs, there may also now be a serious doubt as to whether Plaintiffs can demonstrate Article III standing to allow this case to continue in any manner. It is at least clear they are not the right plaintiffs to seek a statewide injunction." Minute Order, *supra*, p. 7.

Therefore, the stipulated withdrawal of plaintiffs' application for TRO and the distribution of the $76 million did *not* award plaintiffs "much of the relief [they] sought." *Klamath*, p. 1032. Indeed, it is clear that, although plaintiffs dismissed their lawsuit without prejudice as to CDE/SPI, the lawsuit and their motions for preliminary injunctions were shown to be almost wholly lacking in merit. In this context, it would be unjust to award plaintiffs attorney's fees for the stipulated withdrawal of their application for a TRO and the distribution of the $76 million that would have occurred anyway without plaintiffs' actions.

## VII. CONCLUSION

Plaintiffs cannot demonstrate they are a prevailing party either factually or as a matter of law. The Court is therefore respectfully requested to deny their motion.

Dated: April 29, 2011

Respectfully submitted,

AMY BISSON HOLLOWAY
General Counsel

By: /s/ Peter J. Stubbs
PETER J. STUBBS
Deputy General Counsel

- 15 -

Attorneys for Defendants California Department of Education and State Superintendent of Public Instruction, Tom Torlakson